IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BRENDA E. MAGADAN                                             PLAINTIFF

v.                        Civil No. 05-5092

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                        DEFENDANT

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Brenda E. Magadan, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration denying

her application for disability insurance benefits (DIB) under the provisions of Title II. The court

has before it appeal briefs submitted by the parties (Doc. 4 & Doc. 5) and the transcript of the

social security proceedings.

### Procedural Background:

Magadan protectively filed her application for DIB on September 5, 2002. (Tr. 12). She

alleged a disability onset date of January 1, 2001, due to back problems and rheumatoid arthritis.

(Tr. 62-65).[1]

Magadan's application was denied initially and on reconsideration. (Tr. 26-27, 28-29).

She requested a hearing before an Administrative Law Judge (ALJ). (Tr. 40). A hearing was

held on July 15, 2004. (Tr. 359-386). Magadan appeared and testified. (Tr. 363-378). She was

represented by counsel. (Tr. 362). Magadan's husband, Joe Magadan (Tr. 384-385), her Mother,

---

[1]Magadan had filed an application for disability benefits on August 1, 2000, with an alleged disability onset date of
September 28, 1999. (Tr. 12). The application was denied initially on October 27, 2000, and pursued no further. (Tr. 12).

AO72A
(Rev. 8/82)

Betty Lindsay (Tr. 383-384), her son, Lucas Meyer (Tr. 381-383), and a friend, Zondra Goodnight (Tr. 378-381) also testified.

By written decision dated February 25, 2005, the ALJ found that Magadan had severe impairments of degenerative disc disease and chronic pain syndrome. (Tr. 13). However, he found no impairment or combinations of impairments met or equaled one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 13). The ALJ the concluded Magadan had the residual functional capacity (RFC) to perform light exertional activity. (Tr. 18).

The ALJ concluded Magadan could not return to her past relevant work as a nurse's assistant or registered nurse. (Tr. 19). However, using the Medical Vocational Guidelines and the responses of a vocational expert to written interrogatories, he concluded Magadan was capable of making a successful adjustment to work that existed in significant numbers in the national economy. (Tr. 20). The ALJ therefore found Magadan not disabled within the meaning of the Social Security Act. (Tr. 20).

On March 2, 2005, Magadan requested a review on the record. (Tr. 8). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Magadan's request for review. (Tr. 4-7).____

**Evidence Presented:**

At the hearing held on July15, 2004, Magadan testified she has an associate's degree and is a registered nurse. (Tr. 363). She indicated she had primarily made her living as a registered nurse. (Tr. 364). She worked at Washington Regional Medical Center from 1985 until about May of 2002 first as a nurse's assistant and then as a registered nurse (RN). (Tr. 364-365). After

-2-

she became a RN, she worked in the emergency room.  (Tr. 365-367).  In that position, she was on her feet most of the time.  (Tr. 367).

When asked what the easiest job physically there was for a nurse, she stated it would be doing telephone triage.  (Tr. 368).  In Magadan's opinion, she could not do this type of job today.  (Tr. 368).  Magadan testified she had difficulty sitting for long periods of time.  (Tr. 368).  She also stated that the medications she is currently on keep her from concentrating one hundred percent and make her drowsy.  (Tr. 369).

Magadan indicated she has difficulty remembering things at home.  (Tr. 369).  She testified she will forget if she took her medication and has to ask her husband or write it down.  (Tr. 369).

Magadan testified she has difficulty sleeping.  (Tr. 369-370).  She sleeps for forty-five minutes or an hour at a time and has to move from the bed to the couch to the recliner.  (Tr. 370).  Because of this, she stated she is tired during the day and has to take naps periodically.  (Tr. 370).

Magadan testified she takes Methadone, Oxycodone, Valium, Lexapro, Mobic, calcium, and Tenormin.  (Tr. 371).  If she doesn't have Mobic, she substitutes Ibuprofen or Advil.  (Tr. 371).  Other than Tenormin, Magadan indicated all the medications were for pain control and swelling.  (Tr. 371).

Magadan testified she has a lot of muscle spasms in her right buttocks area and right hip area.  (Tr. 371).  She stated she has spasms almost daily but ones that bothered her about three times a week.  (Tr. 372).  She takes Valium to diminish the spasms.  (Tr. 378).

-3-

Magadan testified she has a herniated disc at L5-S1 and a bulging disc at T11-T12. (Tr. 372). She indicated she had been told surgery was not recommended at this point but might be necessary in the future. (Tr. 372).

Magadan testified she injured her back while on-the-job and received workers' compensation for a year. (Tr. 372). Although Dr. Cannon recommended a TENS unit, Magadan has never received one and she assumed it was because of her financial situation although she never specifically discussed it with Dr. Atkinson. (Tr. 373).

Magadan indicated her worse pain is in her low back to the right side and the right buttock area going down her right leg. (Tr. 374). She indicated her pain is constant. (Tr. 374).

She can sit comfortably for about fifteen to twenty minutes. (Tr. 374). To get comfortable at all while sitting, Magadan testified she had to lean towards her left side and take all the weight off her right side. (Tr. 374).

She can do very light housework. (Tr. 374). There are a lot of household chores she can no longer do such as scrubbing her floors, dusting the paneling, and ceiling fans. (Tr. 374-375). She can no longer do yard work and gardening. (Tr. 377).

She can drive a car. (Tr. 375). However, she cannot travel any distance either driving or being a passenger without getting out and moving around. (Tr. 375).

When Magadan first injured her back, she went into the emergency room and was taken off work for that weekend. (Tr. 375). She went to work on Monday, was seen by the workers' compensation doctor and put on light duty for a couple of weeks. (Tr. 375). She was taken off work several times but for only a few days at a time. (Tr. 376).

-4-

Her condition kept getting worse and she asked to see a different doctor. (Tr. 376). After she saw Dr. Runnels, Magadan indicates she was taken off work for a little over five months. (Tr. 376). She made several attempts at returning to work. (Tr. 376). The first time she lasted six weeks. (Tr. 376). The second attempt to return to work she lasted four weeks. (Tr. 376). The third time she was put in non-urgent care doing minor things and lasted four months. (Tr. 376).

Magadan testified Dr. Runnels had placed a twenty pound weight lifting restriction on her. (Tr. 378). While she could bend over and pick up something that weighed twenty pounds, Magadan indicated it would cause her pain. (Tr. 378).

Zondra Goodnight testified she is Magadan's first cousin and also worked with Magadan in the emergency room for almost six years. (Tr. 379). Goodnight testified Magadan was a much better worker than she was. (Tr. 379).

Goodnight testified she has seen Magadan in debilitating, chronic pain. (Tr. 379). Goodnight did not believe Magadan could do any of the jobs at the emergency room. (Tr. 379). Goodnight testified Magadan wouldn't have the freedom to move around when she needed to. (Tr. 379). The less strenuous jobs require a lot of concentration. (Tr. 380).

In the last year, Goodnight testified Magadan has probably stabilized a lot better. (Tr. 381). However, she testified Magadan was a different person than she was before. (Tr. 381). Goodnight indicated Magadan had a different personality was very unhappy now, just sits in the house, and sleeps during the day. (Tr. 381).

AO72A
(Rev. 8/82)

Lucas Meyer, Magadan's son, testified he had seen her in a lot of pain. (Tr. 382). When Magadan worked at the hospital, Meyer testified he worked in the lab and drew blood hospital wide and especially in the emergency room. (Tr. 382).

Meyer testified Magadan was a very hard worker. (Tr. 382). Meyer believed Magadan would work if she could. (Tr. 382).

Betty Lindsay, Magadan's Mother, testified that Magadan cannot pick up her eighteen month old granddaughter. (Tr. 383). Betty testified when Magadan was going to hold the granddaughter Magadan would sit down and Betty would put the granddaughter in Magadan's lap. (Tr. 383). When the granddaughter was a newborn, Magadan could hold her. (Tr. 383).

Betty has seen Magadan not able to walk very well and there are times Magadan cannot get up Betty's three front steps. (Tr. 384). There are also times when Betty will talk to Magadan and she will say she is hurting really badly. (Tr. 384).

Joe Magadan, claimant's husband, testified that Magadan has a lot of problems sleeping. (Tr. 385). She gets up and down all night and when she is sleeping moans in her sleep. (Tr. 385). He indicated she spends most of her time sleeping in their recliner because that is the most comfortable position she can get in. (Tr. 385).

The transcript contains the following pertinent vocational and medical evidence. On February 3 and February 4, 1998, Magadan was seen at the emergency room complaining of flu like symptoms. (Tr. 224 & 222). She was diagnosed with influenza. (Tr. 225 & 223).

On January 9, 1999, Magadan was seen at the emergency room complaining of back pain. (Tr. 217). X-rays of her lumbar spine were negative. (Tr. 218 & 221). She was given a refill

-6-

on her prescription for Skelaxin, a prescription for Lortab, a note for work, and a referral to orthopedics. (Tr. 218).

In January through February of 1999 and again in September of 1999, Magadan underwent physical therapy at the Arkansas Occupational Health Clinic for lumbar strain and facet arthopathy. (Tr. 144-187). On January 13, 1999, Magadan was seen by Dr. Gary L. Moffitt for pain in her lower back. (Tr. 177). She reported that on January 1st when she was helping a patient in the CT scan room he became combative and she was trying to restrain him. (Tr. 177). He was a large man. (Tr. 177). In Magadan's estimation, he weighed more than three hundred pounds. (Tr. 177). She had to keep him restrained for an hour and a half. (Tr. 177). While doing so, Magadan reported she developed pain in her right buttock area and the pain worsened with time. (Tr. 177). Since that time, Magadan reported difficulty going to work. (Tr. 177). She had been seen by a physician in the emergency room and prescribed Skelaxin, Flexeril, and Lorcet-R. (Tr. 177).

Magadan indicated the pain was mostly localized in her lumbosacral region in her right buttock area. (Tr. 177). She stated she had some pain going down her right leg. (Tr. 177).

Dr. Moffitt noted that upon examination Magadan appeared to be in pain. (Tr. 177). She had muscle tightness and spasming in the right buttock, gluteal area. (Tr. 177). She was tender to palpation. (Tr. 177). Reflexes were normal and straight leg raises were normal. (Tr. 177). Magadan was walking with a limp slightly favoring her right side. (Tr. 177).

Dr. Moffitt recommended Magadan be treated with physical therapy. (Tr. 177). Magadan started physical therapy that day and a lot of spasming in the gluteal area was noted. (Tr. 177). She was treated with heat, ultrasound, and massage. (Tr. 177). She was to continue

AO72A
(Rev. 8/82)

the Ibuprofen and Lorcet-5. (Tr. 177). She could return to work but should not lift, push or pull with greater than 10 lbs. of force, should minimize bending and twisting at the waist, and would need to go from sitting to standing to walking as needed. (Tr. 177).

On January 14, 1999, note was made that Magadan continued to have significant muscle spasms and pain. (Tr. 174). On January 18, 1999, Dr. Moffitt noted that Magadan reported she was still having quite a bit of pain in her lower back and buttock region. (Tr. 172). Examination revealed less tenderness to palpation and less muscle tightness in the gluteal region. (Tr. 172). Reflexes were normal as were straight leg raises. (Tr. 172). Magadan was advised she could continue to work with the same restrictions. (Tr. 172). On January 21, 1999, note was made Magadan had markedly improved. (Tr. 168).

On January 25, 1999, Dr. Moffitt noted that Magadan was doing much better. (Tr. 167). He indicated she reported that she had been working in the cath lab and had been able to tolerate this type of work. (Tr. 167). Her examination revealed minimal tenderness to palpation in the right lower lumbar area. (Tr. 167). Dr. Moffitt noted the muscle tightness in the buttock and gluteal region had decreased. (Tr. 167). Straight leg raises were normal and Magadan was able to walk normally. (Tr. 167). Magadan was released to work at full duties. (Tr. 167).

On September 2, 1999, Magadan had an MRI of her lumbar spine. (Tr. 211-212). Magadan's MRI revealed a small left sided L5-S1 herniated disc that abuts the exiting nerve root. (Tr. 211). However, it was noted Magadan did not have left lower extremity symptoms. (Tr. 211). There was evidence of a Schmorl's node at T12-L1 with further degenerative disc changes. (Tr. 211). Magadan had moderate degenerative facet arthropathy at each level and fluid in the facet joints at multiple levels. (Tr. 211).

AO72A
(Rev. 8/82)

On September 3, 1999, Dr. Moffitt noted that Magadan had an epidural steroid injection that helped for a week and a half. (Tr. 160). He stated she continued to have persistent pain in her lower back mostly on the right side. (Tr. 160). Dr. Moffitt indicated Magadan had been continuing to work but having a lot of pain. (Tr. 160). Examination revealed muscle tightness in the right paraspinous muscles in the lumbar area. (Tr. 160). Reflexes were normal as were straight leg raises. (Tr. 160). She had a normal gait. (Tr. 160).

Dr. Moffitt reviewed Magadan's MRI results and stated his opinion that Magadan's main problem was related to the degenerative facet arthropathy. (Tr. 160). He did not recommend more epidural steroid injections. (Tr. 160). He stated Magadan could continue to work with no restrictions. (Tr. 160).

On September 14, 1999, Magadan was referred to the Arkansas Occupational Health Clinic for evaluation and treatment of chronic facet strain. (Tr. 156). Note was made of the fact that she had previously been treated for lumbar and right hip strain. (Tr. 156).

With respect to her range of motion, it was noted she could forward flex to within six inches of the floor but had increased pain with extension. (Tr. 156). Functional limitations were listed as: pain; decreased range of motion; and decreased functional level. (Tr. 156). Magadan was started on a treatment program of myofascial release and moist heat. (Tr. 156). Evaluation revealed a one inch leg length discrepancy as well as the ASIS joint being inferior. (Tr. 156). She was placed on pelvic blocks with moist heat followed by muscle energy. (Tr. 156). Leg lengths were equal at the end of the session and Magadan reported a significant reduction in pain. (Tr. 156). She was to resume doing back exercises. (Tr. 156).

AO 72A
(Rev. 8/82)

On September 21, 1999, Magadan reported significant muscle spasms in the lumbar area. (Tr. 154). She indicated she had increased spasm and pain in the last few days. (Tr. 154). She was treated with massage, ultrasound, and myofascial release. (Tr. 154).

On September 24, 1999, note was made that Magadan had been doing better with therapy but had felt pain in her lower back when pushing a gurney at work on Monday. (Tr. 153). She also had swelling in her right hip area and in the region of the iliac crest. (Tr. 153). Magadan was to stay off work until September 27th. (Tr. 153).

On September 28, 1999, note was made that Magadan was doing a little better but still having a lot of pain. (Tr. 148). There was not as much swelling and her reflexes were normal. (Tr. 148). Dr. Moffitt was of the opinion Magadan would have to stay out of the emergency room for an unspecified period of time. (Tr. 148). He indicated he would "not be surprised if it didn't take up to six months to a year." (Tr. 148). She was not to lift, push, or pull with greater than ten pounds of force. (Tr. 148). She was to minimize her bending and twisting at the waist. (Tr. 148). She needed to be able to go from sitting, standing, to walking on an as needed basis. (Tr. 148).

Magadan reported to her therapist on September 28, 1999, that she had been notified by her supervisor at Washington Regional that they were seeking another employee for her job. (tr. 149). Magadan was put on light duty and moved to temporary employment doing clerical work. (Tr. 149).

Evaluation revealed a leg length discrepancy of 3/4 of an inch. (Tr. 149). There was noted to be mal-alignment of the ASIS and her left leg was externally rotated. (Tr. 149).

AO72A
(Rev. 8/82)

Magadan was placed on pelvic blocks with moist heat. (Tr. 149). She reported numerous muscle spasms. (Tr. 149).

On October 4, 1999, Magadan was seen by Dr. Runnels. (Tr. 270-271). With feet together and knees locked, Magadan came within a foot of touching her toes. (Tr. 270). By bending her knees, she could not increase the range. (Tr. 270). Extension was limited and painful at five degrees and hurt much worse than flexion. (Tr. 270). Neurologically she was totally intact. (Tr. 270). Straight leg raising was negative. (Tr. 270). Hip tests were negative. (Tr. 270).

Dr. Runnels indicated he believed Magadan had degenerative disc disease and had suffered a mild disc bulge but was mainly having facet pain. (Tr. 270). Magadan advised Dr. Runnels that the physical therapists were giving her a lot of extension exercises which would keep it aggravated. (Tr. 270). Dr. Runnels indicated she was to do no extension exercises. (Tr. 270). She was to stay off work two weeks. (Tr. 270-271).

On October 20, 1999, Dr. Runnels saw Magadan. (Tr. 268). He noted Magadan complained she had gotten worse since she had the MRI. (Tr. 268). She was taking the Lortab every four hours although he prescribed it for twice a day. (Tr. 268). She still had low back pain and mid low back pain. (Tr. 268). She indicated therapy made her worse but they were having her do extension exercises. (Tr. 268).

Extension was limited and more painful than flexion. (Tr. 268). Neurologic exam and straight leg raising remained intact. (Tr. 268). Dr. Runnels gave her Depo-Medrol and Decadron intramuscularly and reviewed exercises with her. (Tr. 268). He kept her off work for another two weeks. (Tr. 268). He felt she would pull out of this if she followed the program as directed.

AO72A
(Rev. 8/82)

(Tr. 268). He felt that when she went back to work it would be wise to put her on a lifting restriction for about six months. (Tr. 268).

On October 22, 1999, Dr. Moffitt wrote to a letter to Dr. Runnels to clarify that Magadan had not been doing extension exercises at the clinic. (Tr. 144). Dr. Moffitt noted that Magadan had been treated for a facet problem and that he and his therapist knew that extension needed to be avoided. (Tr. 144).

On October 29, 1999, Magadan saw Dr. Runnels. (Tr. 266). He noted Magadan had degenerative disc disease but nothing operative at that time. (Tr. 266). He opined that she would be able to return to nursing work but he did not think she should go back into the emergency room. (Tr. 266). He indicated he was somewhat surprised she had not improved by now. (Tr. 266). He wondered if there might be some emotional overlay, depression, or something else complicating her problem. (Tr. 266). He indicated she should remain off work for the next two weeks. (Tr. 267).

On November 12, 1999, Dr. Runnels saw Magadan. (Tr. 264). He stated Magadan basically had degenerative disc disease with some bulging. (Tr. 264). At this point, Dr. Runnels noted it had not caused any neurological deficit and did not cause limitation of straight leg raising sign. (Tr. 264). She hurt on extension which compressed her facets. (Tr. 264). For this reason, Dr. Runnels recommended she continue doing her exercises, heat, and medications. (tr. 264).

Dr. Runnels noted it would be perfect if the hospital would give her a job in some sort of administrative capacity where she did not lift patients, do repetitive bending, or work

-12-

overhead. (Tr. 264). He opined that the Americans with Disabilities Act might cover her situation and require modification of her job in such a way as to meet her disabilities. (Tr. 264).

Dr. Runnels indicated she should remain off work for one month unless a sedentary job could be provided. (Tr. 265). He noted she could return at a sedentary position with no lifting greater than twenty-five pounds; no overhead work; no stooping or bending. (Tr. 265). He indicated she would have these restrictions for a year. (Tr. 265).

Dr. Runnels saw Magadan on December 10, 1999. (Tr. 263). He noted she had been doing a "good bit better" until she babysat and lifted the baby which aggravated her. (Tr. 263). Dr. Runnels noted Magadan had learned from her attorney that she could be put in a ward secretary position with the difference in pay made up by Workers' Compensation. (Tr. 263). However, in view of the fact she was a fully trained nurse with experience, Dr. Runnels believed it would be better if she was put in an administrative position that did not require patient lifting or much patient care. (Tr. 263).

Dr. Runnels prescribed Limbitrol because Magadan was having trouble sleeping. (Tr. 263). He noted extension was still most limited at zero degrees. (Tr. 263). On flexion, Dr. Runnels noted Magadan could bend forward and touch her knees. (Tr. 263). By bending her knees, she could increase her range and touch her toes. (Tr. 263). Straight leg raising was negative so Dr. Runnels concluded they could continue to follow her medically. (Tr. 263).

On December 13, 1999, Dr. Alice Martinson performed a consultative examination on Magadan. (Tr. 282-283). Magadan complained her back was constantly sore and the soreness increased with walking or standing longer than twenty minutes. (Tr. 282). Magadan also

AO72A
(Rev. 8/82)

indicated she had intermittent spasms in her back but denied radiation of pain, numbness, and tingling into her leg under most circumstances. (Tr. 282).

On physical examination, Magadan indicated that the area of the thoraco-lumbar junction was the primary area of her complaint although she also had discomfort in her lumbo-sacral junction. (Tr. 283). She had sixty degrees of forward flexion, zero degrees of extension, and ten degrees each of lateral bend and rotation, all without palpable spasm. (Tr. 283). Her seated root test was negative bilaterally. (Tr. 283). Straight leg raising was limited to 60 degrees bilaterally by hamstring tightness. (Tr. 283). Sensory, motor, and deep tendon reflex examinations were normal in both lower extremities. (Tr. 283). Her peripheral pulses were palpable. (Tr. 283). She had no measurable thigh or calf atrophy. (Tr. 283). The FABER test was positive bilaterally. (Tr. 283). She was tender to pressure in the midline of the lower lumbar spine, and along the ilio-lumbar ligaments and sacro-iliac joints bilaterally. (Tr. 283).

Dr. Martinson noted Magadan had significant degenerative disc changes at T12-L1 and to a lesser extent at L5-S1. (Tr. 283). Dr. Martinson believed these demonstrable structural changes were responsible for Magadan's ongoing discomfort. (Tr. 283).

Dr. Martinson concluded Magadan was fit to return to work as a nurse with some restrictions. (Tr. 283). Dr. Martinson believed Magadan should avoid repetitive bending, stooping, and lifting more than 20 pounds. (Tr. 283). Dr. Martinson believed Magadan should avoid work settings which, even though bending, stooping and lifting are not part of the normal job, she might be called upon to take sudden significant spinal loads in order to assist a patient. (Tr. 283).

-14-

On December 22, 1999, Magadan was seen by Dr. Runnels. (Tr. 261). He noted she was much better and working in case management mainly auditing charts. (Tr. 261). He noted that at the present time she had no permanent disability but she would have permanent limitations. (Tr. 261). In particular, he stated she should not be involved with any heavy lifting, repetitive bending, or overhead work. (Tr. 261). He indicated she could return to full duty as of January 4, 2000. (Tr. 262).

Magadan was seen by Dr. Runnels on February 2, 2000. (Tr. 257). She was getting along reasonably well although she had a recent flare-up. (Tr. 257). He noted she was doing risk management at the hospital which was mainly a desk job. (Tr. 257). Dr. Runnels indicated he thought a hot tub would help her significantly but Magadan couldn't afford one. (Tr. 257).

Dr. Runnels decided to send her back to physical therapy. (Tr. 257). On examination, Dr. Runnels noted Magadan could bend forward and almost touch her toes. (Tr. 257). He noted extension was still limited and painful at zero degrees which suggested facet pain and inflammation. (Tr. 257). The neurologic examination was totally normal and straight leg raising negative to ninety degrees. (Tr. 257).

On February 3, 2000, Dr. Runnels indicated Magadan should stay off work for the next five days. (Tr. 259). On February 7, 2000, Dr. Runnels stated Magadan should remain off work for two weeks. (Tr. 258). On February 16, 2000, Dr. Runnels stated Magadan should remain off work for the next three days. (Tr. 256).

On February 21, 2000, Magadan was seen by Dr. Runnels. (Tr. 252). He noted the recent MRI showed only degenerative disease at 5-1, T12-L1, and 11-12. (Tr. 252). It was negative for surgical indications. (Tr. 252).

-15-

He noted Magadan continued to smoke. (Tr. 252). He kept her off work for another week. (Tr. 252). He noted he was hopeful she could return to light duty work. (Tr. 252). He still felt there was a neuralgic component to her condition almost suggestive of post hepatic neuralgia but Magadan denied having any sort of viral infections. (Tr. 252). On February 21, 2000, Dr. Runnels indicated Magadan should remain off work for the next week. (Tr. 254).

On February 21, 2000, an MRI of Magadan's lumbar spine was done. (Tr. 255). It demonstrated a T-12/L-1 disc protrusion with loss of the disc space height and indenting of the thecal sac without significant spinal stenosis or neural foraminal encroachment. (Tr. 255).

On February 23, 2000, Magadan was seen by Dr. Runnels. (Tr. 253). He noted the physical therapy seemed to be helping. (Tr. 253). When he examined her, he found that her right knee jerk was definitely decreased compared to the left. (Tr. 253). This worried Dr. Runnels as Magadan had never had asymmetry of her knee jerk. (Tr. 253). He was concerned Magadan may be getting more bulging of the 3-4 disc of 4-5 disc in the extreme lateral location. (Tr. 253). On February 29, 2000, Dr. Runnels stated Magadan could return to light duty work for twenty hours a week. (Tr. 251).

On March 20, 2000, Dr. Runnels indicated Magadan could return to light duty work with the following limitations: no lifting over twenty-five pounds; no overhead work; no repetitive bending/stooping; and only working eight hours a day, five days a week. (Tr. 250).

On March 29, 2000, Dr. Runnels noted that Magadan was doing well and working four hours a day at a regular nursing job, just avoiding lifting. (Tr. 249). Dr. Runnels indicated Magadan could return to full duty, barring the heavy lifting and overhead work. (Tr. 249). He indicated there was no permanent disability but she would have these permanent limitations. (Tr.

AO72A
(Rev. 8/82)

249). He indicated she would need to do her back exercises and watch her lifting permanently. (Tr. 249).

On May 10, 2000, Dr. Runnels indicated Magadan should remain off work from May 8th through May 15th. (Tr. 248).

On May 12, 2000, Magadan was seen by Dr. David A. Davis, a neurologist, for complaints of persisting low back, right hip, and leg pain she had been experiencing since her on-the-job injury in January, 1999. (Tr. 190). Dr. Davis noted Magadan's MRI of the lumbar spine showed disc herniation at T12-L1 and L5-S1, neither of which appeared to involve neural elements. (Tr. 190). He also noted Magadan had degenerative arthropathy of the facet joints at each level. (Tr. 190).

Magadan's evaluation was remarkable for pain over the sacroiliac joints and right lateral hip with lumbar range of motion, especially extension. (Tr. 190). Focal sensory motor abnormalities were not noted. (Tr. 190). An EMG of the right leg was unrevealing. (Tr. 190).

Dr. Davis concluded it seemed to be musculoskeletal low back pain, probably lumbar strain with exacerbation of preexisting degenerative arthropathy. (Tr. 190). He noted that an important part of her improvement was going to be smoking cessation which would hopefully help in resolving her low back pain. (Tr. 190).

On May 22, 2000, Magadan was seen by Dr. Runnels. (Tr. 247). She was complaining of low back pain, right gluteal pain radiating into her right leg all the way down, and some burning pain in her back. (Tr. 247). Dr. Runnels noted he was still concerned about her right knee jerk. (Tr. 247). He stated it seemed absent to him and he thought her right quadriceps were smaller than her left. (Tr. 247).

-17-

Dr. Runnels indicated he wanted to get an EMG of her right quadriceps and a second opinion from a neurologist because this was the leg that hurts. (Tr. 247). Dr. Runnels indicated it could be some sort of weird neuralgia. (Tr. 247).

On June 12, 2000, Dr. Davis noted Magadan had stopped Celebrex because of peripheral edema and was started on naproxen sodium, 550 mg., twice per day. (Tr. 186). Magadan was also on Neurontin, Wellbutrin, Tenormin, Soma, Ultram or Lortab and had an estrogen shot once a month. (Tr. 186).

It was noted she had a rheumatoid test that was positive at 60 international units per deciliter. (Tr. 186). Dr. Davis noted Magadan seemed to have musculoskeletal low back pain, apparently a combination of lumbar strain and degenerative arthropathy. (Tr. 186). Dr. Davis stated Magadan may have reached maximum medical improvement as there was little else to offer her in the way of further evaluation or treatment for the problem. (tr. 186). He cautioned her about the chronic use of Lortab, Soma, and Ultra. (Tr. 186). Magadan was not given a follow-up appointment but told she could be seen if the need arose.

On June 19, 2000, Dr. Runnels indicated Magadan could return to light duty work with the following restrictions: no lifting greater than twenty-five pounds; no persistent stooping or bending; and work eight hours a day and may take call one weekend per month. (Tr. 246).

On June 28, 2000, Dr. Runnels indicated Magadan should remain off work for the next week. (Tr. 245). On July 6, 2000, Dr. Runnels indicated Magadan should remain off work until July 14, 2000. (Tr. 244).

On July 7, 2000, Dr. Runnels noted that Magadan was starting to improve and was starting to take night call. (Tr. 241). He indicated Dr. Davis tried her on Naproxen but it hurt

-18-

her stomach and caused her ankles to swell so she was put back on Celebrex. (Tr. 241). Dr. Runnels noted an EMG by Dr. Davis was negative although her right knee was still absent. (Tr. 241). Straight leg raising was negative up to 90 degrees. (Tr. 241). Dr. Runnels told Magadan to try to get off Lortab and replace it with Ultram. (Tr. 241).

Dr. Runnels completed an attending physician's statement. (Tr. 242-243). It noted that Magadan had been diagnosed with hip pain and was being provided with conservative care. (Tr. 242). He indicated Magadan could lift twenty-five pounds maximum and could not bend or twist her body. (Tr. 243). He stated she was not capable of working within these limitations. (Tr. 243). He stated she was unable to carry out light duty jobs at that time because of increased pain. (Tr. 243). He indicated he did not know how long these limitations would apply. (Tr. 243).

On July 17, 2000, Dr. Runnels took Magadan off work for three weeks. (Tr. 240). On July 25, 2000, Magadan was seen at the emergency room of Washington Regional Medical Center complaining of neck pain. (Tr. 196). She was given an injection. (Tr. 197).

On July 25, 2000, Magadan was seen by Dr. William Money. (Tr. 227-228). Upon examination, Magadan had no lumbar interspinous tenderness and no facet tenderness. (Tr. 227). There was trace knee reflex on the right and +1 on the left. (Tr. 227). There were no sensory deficits. (Tr. 227). Heel and toe walking were difficult for her because of what Magadan described as gluteal leg pain. (Tr. 227). Straight leg test sitting and lying was negative. (Tr. 227). Dr. Money concluded Magadan had an element of piriformis syndrome. (Tr. 227). He gave her a piriformis injection. (Tr. 227).

He wrote Magadan a note indicating she was unable to work. (Tr. 229). The note indicated her next appointment was scheduled for August 10, 2000. (Tr. 229).

-19-

A letter dated August 4, 2000, indicates Magadan was seen on June 28, 2000,[2] and had been unable to work the last day or so because her whole back has been hurting. (Tr. 239). On examination, Dr. Runnels noted that he could not find the decreased right knee jerk he thought he had found the last time. (Tr. 239). He noted her straight leg raising remained negative. (Tr. 239).

Dr. Runnels indicated he was going to see if Dr. Money thought a course of epidural steroids might be effective. (Tr. 239). Dr. Runnels also sent Magadan back for physical therapy. (Tr. 239). He stated he had taken her off work for one week. (Tr. 239).

On August 9, 2000, in connection with a prior application for disability benefits, Magadan completed a supplemental interview outline. (Tr. 86-90). She indicated she could bathe, dress, shave, and take care of her own hair care needs. (Tr. 86). She stated she could do dishes and iron. (Tr. 86). She indicated it was very difficult for her to do laundry. (Tr. 86). She indicated she could not vacuum/sweep, take out the trash, do home repairs, mow the yard, rake leaves, or do garden work. (Tr. 86). She stated she had been given restrictions that included no repetitive bending, stooping or reaching overhead. (Tr. 86). She indicated she could shop for groceries or clothes, do the banking, and go to the post office. (Tr. 86). She stated she could not push a grocery cart but could go grocery shopping with someone or could go get a few items. (Tr. 86).

Magadan indicated she prepared meals including making sandwiches, frozen dinners, meats, vegetables, desserts, homemade bread, and dishes that required a recipe. (Tr. 87). She

---

[2]The letter actually contained the date June 28, 2002. Obviously, this date was in error.

could pay bills, use a checkbook, and count change. (Tr. 87). She could drive including unfamiliar routes, walk for exercise and errands and use public transportation. (Tr. 87).

She did not use any assistive devices. (Tr. 87). She stated she spent her time attending church, watching television, listening to the radio, reading, and visiting friends and relatives. (Tr. 87). Her disability interfered with her work because she was unable to do light duty work as a registered nurse. (Tr. 87).

She indicated she suffered from unusual fatigue because of her medication and lack of exercise. (Tr. 88). She stated she was required to nap or rest. (Tr. 88).

Magadan indicated she had pain in her lower back and her right hip that radiated down her right leg. (Tr. 88). She also indicated she had spasms and her feet and hands swell. (Tr. 88). She stated her pain was constant. (Tr. 88).

When asked what activities caused the pain or symptoms, Magadan responded: "any type of extra activity or trying to do chores." (Tr. 88). She indicated she woke up hurting. (tr. 88). Bending, sitting a long period, walking a long period, and light household duties, make her symptoms worse. (Tr. 88). Relaxation techniques, hot baths, a heating pad, exercises, and a hot tub all relieve her symptoms. (Tr. 88).

Since her disability began, Magadan indicated that on an average day she did physical therapy, prepared meals, and spent time with her daughter and step-children. (Tr. 89).

On August 10, 2000, Magadan was seen by Dr. Money. (Tr. 226). She was improved but complained of continuing back pain and intermittent back spasming. (Tr. 226). Her puncture site from the piriformis injection was healing well. (Tr. 226). She was assessed with

AO72A
(Rev. 8/82)

piriformis syndrome.[3]   (Tr. 226).   Magadan had discontinued Zanaflex and Baclofen in combination because she could not tolerate them.  (Tr. 226).  She was to restart Baclofen, try Mobic in place of Vioxx, and continue on Elavil and Paxil.  (Tr. 226).  She was also to continue her physical therapy with piriformis stretching.  (Tr. 226).

On August 16, 2000, Magadan was seen by Dr. Runnels.  (Tr. 286).  She reported still having midline low back pain, upper right hip pain, and spasms in her right hip but no longer any leg pain.  (Tr. 286).  She still did not have a good knee jerk on the right but Dr. Runnels noted he could straight leg raise her to ninety degrees.  (Tr. 286).  She got a hot tub.  (Tr. 286).

Magadan reported the hospital had told her there was just nothing at the hospital she could do.  (Tr. 286).  Dr. Runnels noted that standing still bothered Magadan.  (Tr. 286).  He thought she should either settle her workers' compensation claim and get into a different line of work or try doing a job such as auditing charts.  (Tr. 286).

Dr. Runnels noted that Dr. Money suspected Magadan might have piriformis syndrome. (Tr. 286).  Dr. Runnels did not see it as a piriformis syndrome but had not objection to trying anything.  (Tr. 286).  Should Magadan opt to settle her workers' compensation claim, Dr. Runnels estimated she had a 5% permanent disability to the body as a whole.  (Tr. 286).

On September 6, 2000, Magadan had a myelogram of the lumbar spine and a post myelogram CT of the lumbar spine.  (Tr. 232-233).  The myelogram revealed degenerative disc disease at 12/1 with disc space narrowing and osteophyte formation.  (Tr. 235).  It was noted that

_____

[3]Piriformis syndrome is a rare neuromuscular disorder that occurs when the piriformis muscle compresses or irritates the sciatic nerve-the largest nerve in the body. The piriformis muscle is a narrow muscle located in the buttocks. Compression of the sciatic nerve causes pain-frequently described as tingling or numbness-in the buttocks and along the nerve, often down to the leg. The pain may worsen as a result of sitting for a long period of time, climbing stairs, walking, or running. www.ninds.nih.gov/disorders/piriformis_syndrome/piriformis_syndrome.htm

the posterior osteophytes did cause an impression upon the ventral sac at 12/1. (Tr. 235). With this exception, the examination was normal. (Tr. 235). There was no extradural defect affecting the nerve root sleeves and no evidence of intradural disease. (Tr. 235-236).

The CT revealed degenerative changes at the 12/1 level with osteophyte causing a mild impression upon the ventral sac. (Tr. 233). There were no extruded, herniated nucleus pulposus compressing the sac or nerve roots. (Tr. 233).

An x-ray of the lumbar spine was also taken on September 6, 2000. (Tr. 237). It revealed degenerative disc disease at T-12/L-1. (Tr. 237). Otherwise it was unremarkable. (Tr. 237). Lumbosacral junction film revealed no abnormalities. (Tr. 237).

Dr. Runnels saw Magadan on September 8, 2000. (Tr. 285). He reviewed her myelo-CT and saw only minimal midline bulges at 3-4, 4-5, and 5-1. (Tr. 285). Nothing of surgical significance. (Tr. 285). The nerve roots were seen as well. (Tr. 285). Dr. Runnels stated he could not explain the loss of her knee jerk which that day seemed to be trace, compared to zero in the past. (Tr. 285).

She reported that she had seen Dr. Money and tried a Duragesic patch that seemed to work better than any other pain medication. (Tr. 285). As long as Dr. Money was willing to follow her, Dr. Runnels did not believe he needed to continue to see Magadan. (Tr. 285).

Because of her degenerative disc disease, Dr. Runnels told Magadan she would have to do back exercises indefinitely and watch her posture. (Tr. 285). She was to do no lifting over twenty pounds, no repetitive work, and no repetitive bending. (Tr. 285). He believed working in preop would be good for her. (Tr. 285).

-23-

Dr. Runnels also left it to Dr. Money to determine when Magadan could return to work. (Tr. 285). Dr. Runnels released Magadan from his follow-up. (Tr. 285). In his opinion, Magadan would not have a permanent disability but would have the permanent limitations he outlined. (Tr. 285).

On September 26, 2000, Magadan was seen by Dr. Money. (Tr. 303). She had no interspinous tenderness, no facet tenderness but she did have piriformis tenderness-- right. (Tr. 303). Dr. Money repeated her piriformis injection. (Tr. 303).

On October 10, 2000, Magadan was seen at the emergency room for an injury to her left elbow following a fall. (Tr. 292-293). X-rays showed no evidence of fracture or dislocation. (Tr. 293).

On October 12, 2000, Dr. Money saw Magadan. (Tr. 302). He noted she had started back in physical therapy and reported no leg pain but some right gluteal pain and lower sacral lumbosacral pain. (Tr. 302). She denied any radicular component. (Tr. 302). On physical examination, Dr. Money noted Magadan had no interspinous tenderness, no facet tenderness, and minimal right piriformis tenderness. (Tr. 302).

On October 24, 2000, Dr. Steve Owens, a medical consultant, completed a physical residual functional capacity assessment. (Tr. 274-281). With respect to exertional limitations, it stated Magadan could occasionally lift or carry fifty pounds; could frequently lift or carry twenty-five pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and her ability to push and pull was unlimited other than as shown for lift and/or carry. (Tr. 275). No postural, manipulative, visual, communicative, or environmental limitations were established. (Tr. 276-278). At the time,

-24-

there was no treating or examining source statement regarding Magadan's physical capacities in the file. (Tr. 280).

On October 24, 2000, Susan Farque, a vocational analyst, concluded that Magadan had the RFC to perform medium work. (Tr. 91). Farque concluded Magadan could lift a maximum of fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk a total of six hours in an eight hour day; and sit a total of six hours in an eight hour day. (Tr. 91). As a registered nurse was listed in the Dictionary of Occupational Titles as customarily performed as medium work, Farque concluded Magadan could return to the types of work done in the past as usually performed in the national economy. (Tr. 91).

On November 27, 2000, Magadan was seen by Dr. Money. (Tr. 301). She stated she had intermittent piriformis spasming. (Tr. 301). She had absent knee reflex on the right, ankle reflexes were +1 bilaterally with minimal right piriformis tenderness. (Tr. 301).

On December 15, 2000, Dr. Runnels wrote that Magadan had been somewhat of an enigma because he had not found anything on her that looked surgical or that you would think was caused by an accident yet she clearly said her symptoms came as a result of a work related injury. (Tr. 284). He believed settling her workers' compensation claim would be helpful in relieving her symptoms because of psychological reasons. (Tr. 284). Dr. Runnels opined that the case should be settled with a monetary settlement of about 5% permanent disability and then she would be motivated to do the things which would keep her employable such as back exercises, watching her posture, avoiding heavy lifting, etc. (Tr. 284).

On January 26, 2001, Magadan was seen by Dr. Money. (Tr. 300). She had some sciatic notch tenderness on the right greater than the left. (Tr. 300). She was noted to have an absent

AO72A
(Rev. 8/82)

knee reflex on the right. (Tr. 300). Note was made of the fact that she was working light duty two days a week. (Tr. 300).

On April 5, 2001, Magadan was seen by Dr. Money. (Tr. 299). She reported intermittent right leg pain. (Tr. 299). He noted that overall she was improving. (Tr. 299). He noted she was working ten hours a week. (Tr. 299).

On June 25, 2001, Magadan was treated for a corneal abrasion. (Tr. 290).

On July 10, 2001, Magadan had an MRI of her pelvis and hips done. (Tr. 289). The examination was unremarkable. (Tr. 289).

On October 23, 2001, Magadan was seen by Dr. Money. (Tr. 297). He noted she was working twelve hours a week and tolerating that. (Tr. 297). In his opinion, she would not be able to tolerate working any more than that. (Tr. 297).

On January 14, 2002, Magadan was seen by Dr. Money. (Tr. 296). He noted she had decreased quadriceps function, right compared to left. (Tr. 296). Right S1 notch tenderness. (Tr. 296). Ankle reflexes were +1 bilaterally. (Tr. 296). He also noted that she had a motor deficit but no sensory deficits. (Tr. 296).

On February 28, 2002, Magadan was seen by Dr. Money. (Tr. 295). He noted she had S1 joint tenderness and 5-1 facet tenderness. (Tr. 295). Dr. Money listed his assessment as: piriformis syndrome, chronic; and intermittent radiculitis secondary to piriformis syndrome. (Tr. 295).

On April 1, 2002, Magadan was seen by Dr. Money. (Tr. 294). She had right S1 notch tenderness. (Tr. 294). Dorsiflexion and plantar flexion were equal. (Tr. 294). Reflexes were +1 bilaterally. (Tr. 294).

-26-

On June 21, 2002, an MRI of Magadan's lumbar spine was done. (Tr. 320). It revealed a large posterior spur and degenerative disc disease at T12-L1. (Tr. 320). This caused some effacement of the subarachnoid space and no neural element compromise. (Tr. 320).

From May 16, 2002, through January 7, 2004, Magadan saw Dr. Thomas W. Atkinson for pain management. (Tr. 311-328, 339, 341-345). Dr. Atkinson saw Magadan initially on May 16, 2002. (Tr. 327-328). He diagnosed her with right radicular pain L4-5, history of herniated nucleus pulposus (HNP), and chronic pain. (Tr. 327). On June 13, 2002, Magadan reported that she had been unable to go to work because of pain and tingling down her right leg and pain in her right buttock. (Tr. 326). Note was made of the fact that her reflexes were diminished on the right and 1+ on the left. (Tr. 326).

On August 7, 2002, note was made that Magadan was walking stiffly. (Tr. 318). On September 5, 2002, Magadan reported that she ran short on Roxicodone because of her son's marriage and the in-laws being in town. (Tr. 317). On October 3, 2002, Magadan complained of being in a lot more pain and swelling. (Tr. 316). On October 28, 2000, Magadan reported that the cold weather was making her pain worse. (Tr. 314). On November 21, 2002, Dr. Atkinson and Magadan discussed rheumatoid arthritis and diffuse pain. (Tr. 312). Magadan reported severe stiffness in the morning with it taking her three hours to warm up. (Tr. 311). On December 17, 2002, Magadan complained that her pain was especially bad at night. (Tr. 311). She was prescribed Duragesic patches, Roxicodone, and Ambien. (Tr. 311).

On October 25, 2002, Magadan completed a supplemental interview outline. (Tr. 97-101). She indicated she could bathe, dress, shave, and take care of her own hair care needs. (Tr. 97). She stated she could do the dishes and iron. (Tr. 97). She indicated she could not do

-27-

laundry, change sheets, vacuum/sweep, take out the trash, do home repairs, wash the car, mow the yard, rake leaves, or do garden work. (Tr. 97). She stated laundry involved too much stooping and changing sheets involved too much twisting. (Tr. 97). She indicated she couldn't take the trash out if it was heavy and couldn't do yard work because it involved bending and squatting which increased her pain. (Tr. 97).

She indicated she could shop for groceries or clothes, do the banking, and go to the post office. (Tr. 97). Magadan indicated she prepared meals four times a week including making sandwiches, frozen dinners, meats, vegetables, desserts, and dishes that required a recipe. (Tr. 98). Since her disability began, Magadan stated it took her thirty minutes longer than normal to prepare meals. (Tr. 98).

She could pay bills, use a checkbook, and count change. (Tr. 98). She could drive including unfamiliar routes, walk for exercise and errands and use public transportation. (Tr. 98). However, she noted that she could not drive a standard car because it involved pushing in the clutch. (Tr. 98).

She has a handicapped-equipped vehicle. (Tr. 98). She does not use any assistive devices. (Tr. 98). She stated she spends her time attending church, watching television, listening to the radio, reading, and visiting friends and relatives. (Tr. 98). For recreation, Magadan indicated she raises small dogs and goes to flea markets when she is able to. (Tr. 98).

Her disability interfered with her work because at the end of a five or six hours shift she would be in extreme pain. (Tr. 98). Magadan indicated by the end of the shift she was sometimes unable to walk to get to her car to drive home. (Tr. 98). Because of her disability,

AO72A
(Rev. 8/82)

she indicated she is unable to be a trauma nurse or engage in her career. (Tr. 98). Magadan indicated she cannot sit, stand, or walk for over an hour. (Tr. 98).

She indicated she did not suffer from unusual fatigue but was required to nap or rest twice or more a day for one to two hours. (Tr. 99). Magadan indicated she had pain in her lower back, right hip, right leg, feet, hands, and elbows. (Tr. 99). She also indicated she had spasms and her feet and hands swell. (Tr. 99). She stated her pain was constant. (Tr. 99).

When asked what activities caused the pain or symptoms, Magadan indicated light housework, dusting, laundry, stooping, sweeping, twisting, sitting, standing, and walking for long periods. (Tr. 99). Heat and exercise relieve her symptoms. (Tr. 99).

Since her disability began, Magadan indicated that on an average day she did light housework, visited with her family and children, spent time with her husband, cared for her small dogs, cooked light meals, and worked on the computer for less than an hour. (Tr. 100). Before her disability, Magadan indicated she worked forty to sixty hours a week, did all the housework, and did yard work and gardening. (Tr. 100).

On October 14, 2002, Magadan underwent a consultative examination performed by Dr. Randall Hendricks. (Tr. 305-307). Magadan's sciatic stretch test was negative bilaterally. (Tr. 306). She had some patchy numbness in the leg but nothing dramatic and Dr. Hendricks noted that in essence her strength was normal and her motor tone was satisfactory. (Tr. 306). He noted there was no visible atrophy in her legs. (Tr. 306). She could heel and toe walk. (Tr. 306).

Dr. Hendricks wanted to review the most recent MRI of the lumbar spine completed on 6/21/02. (Tr. 307). He also thought an awake lumbar diskogram would assist in resolving whether or not the L5-S1 disk was causing any component of Magadan's symptoms. (Tr. 307).

-29-

He believed Magadan was taking too much narcotic pain medication given the physical examination and the diagnostic studies he had reviewed had not suggested anything specifically abnormal which would be causing her complaints of pain. (Tr. 307).

On January 27, 2003, S. Summers, a vocational analyst, concluded Magadan retained the RFC to perform a full range of light work. (Tr. 126). Summers concluded Magadan was unable to return to her past relevant work and had no transferrable skills. (Tr. 126).

On January 27, 2003, Dr. Jerry Thomas completed a physical residual functional capacity assessment. (Tr. 329-336). With respect to exertional limitations, it stated Magadan could occasionally lift or carry twenty pounds; could frequently lift or carry ten pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and her ability to push and pull was unlimited other than as shown for lift and/or carry. (Tr. 330). No postural, manipulative, visual, communicative, or environmental limitations were established. (Tr. 331-333). At the time, there was no treating or examining source statement regarding Magadan's physical capacities in the file. (Tr. 336).

On March 13, 2003, Dr. R. David Cannon noted that Magadan had chronic pain syndrome and treating her with opioid therapy certainly appeared to be appropriate. (Tr. 340). He noted that a TENS unit could be added into the therapy. (Tr. 340).

On September 14, 2004, Dr. Alice Martinson evaluated Magadan at the request of the administration. (346-348). Dr. Martinson noted that none of the diagnostic studies had provided an anatomic explanation for Magadan's ongoing complaints. (Tr. 346).

Magadan complained of severe low back pain with frequent radiation into her right buttock and rare radiation as far as the top of her right foot. (Tr. 346). She indicated her

-30-

symptoms were made worse by bending or stooping. (Tr. 346). She stated her back pain and stiffness increased if she sits longer than an hour or walks more than several blocks. (Tr. 346). She reported suffering sleep disturbance and generalized morning stiffness. (Tr. 346). She indicated she had been told she has rheumatoid arthritis but has no peripheral joint swelling or complaints. (Tr. 346). She reported the injections in her back provided less than one week's worth of benefit and injections into her right buttock because of the possibility of piriformis syndrome provided no benefit. (Tr. 346).

On physical examination, Dr. Atkinson reported that Magadan appeared chronically depressed. (Tr. 347). It was noted her speech was slow and monotonous and she was devoid of facial expression. (Tr. 347). Magadan markedly limited her forward flexion to no more than about forty degrees saying that to bend further would cause too much pain. (Tr. 347). She has zero degrees of extension, lateral bend, and rotation for the same reason. (Tr. 347). She had no palpable spasm with any of the maneuvers. (Tr. 347).

Magadan's seated root test was negative bilaterally. (Tr. 347). Straight leg raising was limited to seventy degrees bilaterally by hamstring tightness. (Tr. 347). The FABER test was mildly positive for low back pain on both sides. (Tr. 347). Sensory, motor, and deep tendon reflex examinations were normal in both lower extremities. (Tr. 347). She had no widespread tenderness in any of her muscle masses. (Tr. 347). She was tender to pressure deep in the right buttock and in the midline at the lumboscaral junction. (Tr. 347).

Dr. Atkinson concluded Magadan appeared to have only mechanical low back complaints without evidence of neurologic abnormality. (Tr. 347). Dr. Atkinson noted the severity of Magadan's complaints and life dysfunction were greatly disproportionate to her objective

-31-

physical and diagnostic findings. (Tr. 347). Dr. Atkinson was of the opinion that Magadan clearly merited a diagnosis of chronic pain syndrome and was narcotic dependent. (Tr. 347). In Dr. Atkinson's opinion, psychological evaluation and testing should be accomplished and the results considered in adjudication of the case. (Tr. 347).

Dr. Atkinson concluded the primary factor that incapacitated Magadan from work was chronic narcotic dependence. (Tr. 348). A five percent total body impairment rating was permitted based on the degenerative disc changes known to be present. (Tr. 348).

Dr. Atkinson also completed a medical assessment of ability to do work-related activities (physical). (Tr. 353-354). She noted Magadan could: lift ten pounds frequently and twenty pounds occasionally; stand/walk less than two hours in an eight hour day and no more than ten minutes without interruption; could sit six to eight hours in an eight hour day but no more than one hour without interruption; never stoop or crouch; and only occasionally climb, balance, kneel or crawl. (Tr. 353-354). Dr. Atkinson also noted that the chronic pain syndrome and narcotic dependence severely incapacitated Magadan from jobs requiring intellectual effort. (Tr. 355).

On December 17, 2004, Floyd John Massey, a vocational expert, responded to written interrogatories propounded by the ALJ. (Tr. 140-141). For the first hypothetical question, Massey was asked to assume a hypothetical person of Magadan's age, education and with the same work history with the following limitations:

> This person can occasionally lift/carry 20 lbs. and frequently 10. This person can sit 8 hours during a business day, and 1 hour without interruption. This person can stand between 1 and 2 hours and 10 minutes without having to sit down. This person can not stoop or crouch. This person can occasionally climb, balance, kneel, and crawl.

(Tr. 141).

-32-

Massey concluded this individual could not perform Magadan's past relevant work. (Tr. 141). However, the hypothetical claimant could do the following jobs: receptionist/information clerk; hospital administration; dispatcher (non police-fire). (Tr. 141).

Massey was then asked to assume the same hypothetical person with the following additional limitations:

> This person suffers from chronic pain and from fatigue. This person can lift 20 lbs occasionally and 10 lbs frequently. This person can sit for no more than 30 minutes at a time and can stand for no more than 10 minutes at a time. This person would require frequent, lengthy, and unscheduled breaks with the result that the total time the person could sit, stand, and walk would be something less than 8 hours in a business day. Because of required medications' side effects, this person would have no useful ability to maintain attention and concentration or to understand, remember, and carry out complex instructions and would be seriously limited in the ability to understand, remember, carry out simple instructions.

(Tr. 141).

Massey concluded this person could not return to any work reflected in the vocational materials he had reviewed. (Tr. 141). Massey concluded there were no jobs in the local, regional, or national economies this person could do. (Tr. 141).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the

-33-

Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only

AO72A
(Rev. 8/82)

if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

Magadan argues the ALJ erred in evaluating her credibility and determining her RFC because the ALJ did not give adequate consideration to her non-exertional impairments. Magadan contends non-exertional impairments, including pain and psychiatric problems, cannot necessarily be measured or detected through objective means. She contends the ALJ failed to consider her medications and their side effects. We agree.

In disability determinations, credibility assessments are the province of the ALJ. *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir. 1992). This court will not substitute its judgment for that of the trier of fact, *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996), nor will we disturb the decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993).

In this case, although the ALJ's decision recited the factors that must be considered in evaluating a claimant's allegations of disabling pain, we believe the ALJ failed to properly evaluate the factors. In evaluating a claimant's allegations, the ALJ must consider the objective medical evidence; the claimant's prior work history; the claimant's daily activities; the duration, frequency and intensity of pain; the dosage, effectiveness and side effects of medications; precipitating and aggravating facts; and functional restrictions. *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002)(*citing Polaski v. Heckler*, 739 F.2d1320, 1322 (8th Cir. 1984)).

AO72A
(Rev. 8/82)

Here, the ALJ carefully reviewed the medical records, the supplemental interview outlines, summarized the hearing testimony, and set forth the proper factors to be considered, the ALJ then, virtually without discussion, found Magadan's complaints of disabling pain not to be fully credible. Magadan testified she does not sleep well, cannot sit for very long, cannot lift very much, is in constant pain, and that the side effects from her medication prevents her from concentrating and causes her to be drowsy. (Tr. 368-370, 374 378). She testified she can only do very light housework. (Tr. 374).

We note that has been persistent in seeking medical treatment for her lower back, right hip, and right buttocks pain. Her persistence supports her credibility. *See e.g., O'Donnell v. Barnhart*, 318 F.3d 811, 817 (8th Cir. 2003).

She has sought treatment for low back pain over a significant period of time. She has underwent a variety of diagnostic tests including x-rays and MRI's. She has had injections and underwent physical therapy. The Eighth Circuit has stated that "consistent diagnosis of chronic . . . pain, coupled with a long history of pain management and drug therapy," is an "objective medical fact" supporting allegations of disabling pain. *Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998).

Dr. Thomas Atkinson and Dr. Alice Atkinson both noted Magadan suffered from chronic pain syndrome. *See e.g.,* (Tr. 339 & 347). Dr. Runnels indicated there was an emotional overlay, depression, complicating Magadan's problems. (Tr. 266).

Magadan's medical records and her testimony at the hearing indicate she was on Oxycodone, among other things, for the pain. (Tr. 371). "[O]xycodone, is prescribed for 'the management of moderate to severe pain when a continuous, around the clock analgesic is needed

-36-

for an extended period of time." *O'Donnell*, 318 F.3d at 817 (*quoting Physician's Desk Reference (PDR)* 2912 (5th ed. 2002)). Despite this, there was no discussion of this powerful pain medication in evaluating her allegations of disabling pain or any discussion on how the side effects from the pain medication could impact her ability to do work related activities. *See Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002)(noting use of OxyContin supported allegations of disabling pain).

Additionally, Magadan testified to extremely limited daily activities. The testimony regarding her limited abilities was supported by the testimony of her husband, her son, her Mother, and her cousin and former co-worker. *See Neely v. Shalala*, 997 F.2d 437, 441 (8th Cir. 1993)(noting ALJ improperly discounted claimant's spouse testimony of limited daily activity solely because it might be influenced by sympathy for claimant). She also reported limitations on her abilities to stand, walk, and sit to her treating physicians. There are also repeated references in the records to Magadan reporting low back pain on a daily basis. The ALJ did not discuss how the pain would impact Magadan's ability to do work-related activities. This is true despite the diagnosis of chronic pain syndrome.

For the reasons stated, we believe remand is necessary in this case. The record needs to be developed with respect to any side effects from the prescription pain medication she is on and her allegations of disabling pain. The Commissioner may want to consider obtaining a residual physical functional capacity assessment from Magadan's treating physician. The Commissioner may also want to obtain, as suggested by Dr. Alice Martinson in her report on her consultative examination, a psychological evaluation of Magadan in view of the chronic pain syndrome and depression.

-37-

**Conclusion**:

For the reasons stated, I recommend that the decision of the Commissioner be reversed and the case remanded. **The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Dated this 26th day of June 2006.


/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)